Nos. 14-4549, 14-4550

# In the United States Court of Appeals for the Third Circuit

---

DANIEL BINDERUP,

Plaintiff-Appellee/
Cross-Appellant,

v.

ATTORNEY GENERAL OF THE UNITED STATES, ET AL.,

Defendants-Appellants/
Cross-Appellees.

---

Appeal from a Judgment of the
United States District Court for the Eastern District of Pennsylvania
The Hon. James Knoll Gardner, District Judge
(Dist. Ct. No. 13-CV-06750-JKG)

---

APPELLEE/CROSS-APPELLANT'S REPLY BRIEF

---

Douglas Gould
PIZONKA, RIELLEY, BELLO
  & MCGRORY, P.C.
144 E. DeKalb Pike, Suite 300
King of Prussia, PA 19406
610.992.1300/610.992.1505

Alan Gura
  Counsel of Record
GURA & POSSESSKY, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314
703.835.9085/703.997.7665

June 26, 2015

*Counsel for Appellee/
Cross-Appellant*

# TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    The Government Persists in Misstating Binderup's
        Statutory Claim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    The Government Fails to Explain Why "Punishable By"
        Means One Thing as Used in Section 922(g)(1) and
        Something Else as Used in Section 921(a)(20)(B). . . . . . . . . 3

    III.    The Constitutional Avoidance Doctrine Counsels a
        Serious Examination of Binderup's Statutory Claim. . . . . . 5

        A.    Only Dangerousness, Not Lack of "Virtue,"
              Can Support the Deprivation of Second
              Amendment Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.    Binderup Never Argued That Firearms Prohibitions
              Must Match Those of the Eighteenth Century. . . . . . 12

        C.    Constitutional Avoidance is Warranted Because As-
              Applied Challenges are a Real Feature of Today's
              Legal System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        D.    The Government's New Evidentiary Objections
              On Appeal Are Improper. . . . . . . . . . . . . . . . . . . . . . . 19

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

Cases

*Dickerson* v. *New Banner Inst., Inc.*,
460 U.S. 103 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*Gowder* v. *City of Chicago*,
923 F. Supp. 2d 1110 (N.D. Ill. 2012). . . . . . . . . . . . . . . . . . . . . . 16

*Interface Group-Nevada* v. *TWA (In re TWA)*,
145 F.3d 124 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Pontarelli* v. *U.S. Dep't of Treasury*,
285 F.3d 216 (3d Cir. 2002) (en banc). . . . . . . . . . . . . . . . . . . . . . 18

*Suarez* v. *Holder*, No. 1:14-CV-958,
2015 U.S. Dist. LEXIS 19378 (M.D. Pa. Feb. 18, 2015). . . . . . . . . 6

*United States* v. *Barton*,
633 F.3d 168 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . 8, 11, 15-19

*United States* v. *Carpio-Leon*,
701 F.3d 974 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*United States* v. *Chester*,
628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Chovan*,
735 F.3d 1127 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Essig*,
10 F.3d 968 (3d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Statutes and Rules

18 U.S.C. § 921(a)(20)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-5

18 U.S.C. § 922(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-6, 8, 17

18 U.S.C. § 925(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Other Authorities

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 144 (Winter 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461(1995). . . . . . . . . . . . . . . . . 9, 10

Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002). . . . . . . . . . . . . . . 10-12

Volokh, Eugene, *A rare Second Amendment exemption from federal ban on felons possessing guns*, Washington Post, Sept. 27, 2014, available at http://www.washingtonpost.com/news/volokh-conspiracy/ wp/2014/09/27/a-rare-second-amendment-exemption-from-federal-ban-on-felons-possessing-guns/ (last visited June 25, 2015). . . . . . . . . . . 6

## INTRODUCTION

Ascribing outlandish straw-man claims to one's opponent may make for lively reading, but it also renders a brief unresponsive. Respectfully, this is a serious case. Right or wrong, Binderup's claims are sufficiently weighty that the District Court addressed them directly even where it disagreed, and in fact, enjoined enforcement of a federal law on constitutional grounds. Another judge, in another District Court, followed the same approach. The Government should have addressed, rather than distorted, the claims Binderup actually made.

Unwilling to give Binderup's argument a fair or even logical reading, the Government's response is at best inapposite and often something much worse. It answers arguments not made, errs on the law, raises new issues on appeal, and seeks to evade the constitutional avoidance doctrine by grossly misrepresenting an argument that has persuaded two federal judges. This fact alone—that federal courts have accepted Binderup's constitutional argument—signals a need to address, not dismiss, Binderup's substantial statutory claim.

## I. THE GOVERNMENT PERSISTS IN MISSTATING BINDERUP'S STATUTORY CLAIM.

In moving to dismiss Binderup's complaint, the Government claimed that Binderup had challenged Section 922(g)(1)'s[1] application on the theory that the statute "depends on the sentence *actually imposed* rather than the maximum potential sentence applicable" to the underlying violation. R. 11 at 4 (emphasis in original). But Binderup asserted no such theory. With respect to his actual no-imprisonment sentence, Binderup's complaint offered only that it "demonstrated," 2 App. 106 ¶ 26, the fact that his violation was "punishable by a term of imprisonment of two years or less." Section 921(a)(20)(B). A five year sentence would not have demonstrated this fact, but neither would it have defeated Binderup's argument about the statute's inherent quality of allowing for a range of punishment of two years or less.

Binderup expressly denied seeking relief based on the sentence imposed. R. 14, at 3-4. The District Court understood and directly addressed Binderup's statutory claim, even though it ruled against it.

---

[1]All statutory references are to Title 18 of the United States Code.

By now, the Government should have understood the point as well. Instead, it obfuscates matters by returning to its original misreading of Binderup's statutory claim. "He argues, however, that he did not, in fact, serve any prison time, from which he reasons that his crime was also 'punishable' by a sentence of less than two years." Opp. at 1.

No, he does not argue that. He has never argued that. The Government may *prefer* that Binderup had argued that, because the argument is wrong, but he did not in fact make that argument. The parties are in perfect agreement that "the sentence actually imposed does not affect the application of the statute." Opp. at 6. But that's not and never has been this case.[2]

II. THE GOVERNMENT FAILS TO EXPLAIN WHY "PUNISHABLE BY" MEANS ONE THING AS USED IN SECTION 922(G)(1) AND SOMETHING ELSE AS USED IN SECTION 921(A)(20)(B).

Not until page 7 of its opposition does the Government get around to accurately describing Binderup's claim—that his violation was "capable

---

[2]The Government also misstates Section 921(a)(20)(B), claiming that "Congress made the prohibition applicable only to those misdemeanors 'punishable by a term of imprisonment' of more than two years." Opp. at 5-6. As Binderup previously pointed out, this is not what the statute provides. Appellee's Br. at 15, 24-26. Section 921(a)(20)(B) does not include anything; it *excludes* crimes "punishable by" two years or less.

of being punished by" a "sentence of two years or less." Opp. at 7 (quotation omitted). Having just described that "punishable by" means "capable of being punished by" for purposes of Section 922(g)(1), this is the point at which one would have expected to see a response to Binderup's exhaustive survey that the same words used in the definitional section (921(a)(20)(B)) would have the same meaning when used in the operative section (922(g)(1)) in the same statutory scheme. Instead, the Government merely laments that this would not disarm as many people as perhaps should be disarmed (an easy enough problem to fix, if Congress agreed it's a problem), and then, "Binderup's argument is precluded by *Essig*, *Dickerson*, and common sense." Opp. at 7 (referencing *Dickerson* v. *New Banner Inst., Inc.*, 460 U.S. 103 (1983), *United States* v. *Essig*, 10 F.3d 968 (3d Cir. 1993), and a sense not shared by Binderup or, for that matter, by Congress).

Except, as Binderup demonstrated, *Essig* did not address his argument and should not be controlling. Neither did *Dickerson* address this situation. And surely there is more to briefing in this Court than to declare that one's adversary lacks "common sense."

But the Government simply goes on to state that the rule of lenity "provides no basis for disregarding controlling precedent," Opp. at 8, without actually describing why or how precedent supports its views or what flaws might exist in Binderup's argument. The Government has thus largely waived arguments contesting Binderup's statutory claims. Cf. *Interface Group-Nevada* v. *TWA (In re TWA)*, 145 F.3d 124, 133 (3d Cir. 1998) ("arguments mentioned in passing but not squarely argued will be deemed waived") (quotation omitted).

III. THE CONSTITUTIONAL AVOIDANCE DOCTRINE COUNSELS A SERIOUS EXAMINATION OF BINDERUP'S STATUTORY CLAIM.

Having misrepresented the statutory claim as being sentencing-based, and all-but defaulting in response to the bulk of Binderup's brief, the Government turns to Binderup's constitutional avoidance argument. Instead of discussing the doctrine in any meaningful way, including the manner in which constitutional avoidance impacts the validity of precedent decided under an obsolete understanding of controlling constitutional principles, the Government offers:

As discussed in our opening brief and at Point II below, plaintiff raises no serious doubts as to the constitutionality of sections 922(g)(1) and 921(a)(20)(B).

Opp. at 8.

The claim is astonishing. Judge Gardner more than raised "serious doubts" as to the constitutionality of Section 922(g)(1)'s application against Binderup—the Government is the *appellant* here. One of the Nation's most respected legal scholars, Prof. Eugene Volokh, agreed that the District Court's decision is correct:

> I'm not sure whether the government will appeal, but, if it does, I expect the case will stand up on appeal, given the Third Circuit's *Barton* precedent; and I doubt that the U.S. Supreme Court would agree to hear the case.[3]

In the Middle District of Pennsylvania's companion case, Judge Caldwell only slightly differed in his methodology, and enjoined Section 922(g)(1)'s application. *Suarez* v. *Holder*, No. 1:14-CV-958, 2015 U.S. Dist. LEXIS 19378 (M.D. Pa. Feb. 18, 2015).

It is one thing to claim that two federal judges and a leading scholar are wrong (though they are not), quite another to claim that their position is so insubstantial as to not merit basic caution in the application of an ambiguous criminal statute.

---

[3]Volokh, Eugene, *A rare Second Amendment exemption from federal ban on felons possessing guns*, Washington Post, Sept. 27, 2014, available at http://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/09/27/a-rare-second-amendment-exemption-from-federal-ban-on-felons-possessing-guns/ (last visited June 25, 2015).

The Government assails the very legitimacy of a constitutional argument it has now lost twice in federal district courts by advancing four dramatic, and dramatically wrong, propositions. First, the Government suggests that it may disarm anyone deemed lacking in "virtue." Second, it vigorously attacks arguments found nowhere in Binderup's brief by any reasonable reading. Third, the Government repeats its claim that as-applied challenges are essentially unavailable, because *generalized* statistical surveys can overcome an *as-applied* Second Amendment challenge. And for good measure, the Government offers an entirely new argument on appeal apparently suggesting, at this very late stage, that the District Court should have simply disregarded the evidence.

Each point is addressed in turn.

A.   Only Dangerousness, Not Lack of "Virtue," Can Support the Deprivation of Second Amendment Rights.

Hawthorne's "The Scarlet Letter" is an historical fiction, not a model for gun control. Dangerous criminals, the mentally ill, and others who cannot be trusted with firearms are often, in a sense, "unvirtuous." But the prohibitions they suffer are permissible because they pass constitutional scrutiny, not because the United States has ever been

among the sorry regimes where functionaries are empowered to deprive people of liberty by moral proclamations.

This Court's precedent requires an examination into "the traditional justifications underlying" Section 922(g)(1). *United States* v. *Barton*, 633 F.3d 168, 173 (3d Cir. 2011). These are not abstract concepts of "virtue" but realistic concerns inquiring as to the threat, if any, that an individual may pose to the community if armed. The *Barton* factors are not based on morality, but on the notion that "the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses." *Id.*

*Barton* is circuit precedent, notwithstanding the number of decisions the Government cites which recite the shibboleth that in the Framing Era, "the government could disarm 'unvirtuous citizens.'" *United States* v. *Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012) (quotation and citations omitted). This is overstated—it was not enough to proclaim someone "unvirtuous." Rather, categories of people who were not, *per modern law professors*, "virtuous citizens," could be disarmed for some reason directly bearing on their fitness to responsibly possess arms, *e.g.*, criminal misconduct.

*Carpio-Leon* is itself an excellent example. In that case, the Fourth Circuit held that "illegal aliens," people lacking a proper immigration status, could be disarmed as they are not part of the American political community. But *just like Barton*, the Fourth Circuit cautioned:

> [W]e do not hold that any person committing any crime automatically loses the protection of the Second Amendment. The *Heller* Court's holding that defines the core right to bear arms by law-abiding, responsible citizens does not preclude some future determination that persons who commit some offenses might nonetheless remain in the protected class of "law-abiding, responsible" persons.

*Carpio-Leon*, 701 F.3d at 981. How does this help the Government's claim?[4]

At the heart of the alleged scholarly support for the Government's "virtuousness" argument lie three law review articles: Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 144, 146 (Winter 1986); and Saul

---

[4]Moreover, it would have been grossly unfair to label Mr. Carpio-Leon "unvirtuous." While he had used a false Social Security number to obtain a driver's license, he lived with his wife for 13 years, raising three American-born children, paid his taxes, and possessed only ordinary guns commonly used for self-defense. *Id.* at 976. He might well have been as virtuous as his documented or citizen neighbors.

Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002). But do these articles really suggest that mere lack of virtue triggered disarmament?

Prof. Reynolds's treatment of the issue in his *Critical Guide* footnotes two sources for his claims on virtuousness and disarmament: the Kates *Dialogue* article at the same page cited by the Government, 62 Tenn. L. Rev. at 480 n.86; and Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 215-16 (1983), 62 Tenn. L. Rev. at 480 n.87.

Kates's *Dialogue* contains the familiar language borrowed by Reynolds, for which it provides a citation to Kates's *Handgun Prohibition* article, at 266 as "(citing formulations in which the Founders explicitly limited the right to law-abiding citizens)." 49 Law & Contemp. Probs. at 146 n.19. This description does not mention "virtuousness," and indeed, turning to the *Handgun Prohibition* article, at 266, one finds a claim only that felons were outside the common law because they typically faced dispossession and death. Kates notes that "[w]e may presume that persons confined in gaols awaiting trial on

criminal charges were also debarred from the possession of arms," and that "[a]ll the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent." 82 Mich. L. Rev. at 266.

None of this is incompatible with *Barton*. To support his proposition, Kates refers the reader to "notes 70, 72 & 83 supra and accompanying text." *Id.* at 266 n.267. These notes merely cite the right to arms proposals made in the New Hampshire, Pennsylvania, and Massachusetts conventions, which excluded non-peaceable and dangerous citizens from the right. Turning to pages 215-16 of the same article, cited earlier by Reynolds, one finds only a discussion of the militia system.

That leaves the Court with the citation to Prof. Cornell's ironically titled "Don't Know Much About History" article. Cornell, arguably the leading champion of the "collective rights" theory repeatedly rejected by the Supreme Court, states that the "right [to arms] was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."

29 N. Ky. L. Rev. at 679. Footnotes lead to a "discussion" on the next page, which does not discuss the "virtuousness" theory at all.

Consistent with some of the language in the above-referenced articles (if not any actual historical sources they cite), the Government goes on to suggest that *other* critical constitutional rights, such as the right to vote, serve on a jury, and engage in various professions, may also be denied to the supposedly unvirtuous among us. But the Government then suggests that the virtuousness inquiry is nothing more than a nod to the felon prohibition after all: "Accordingly, as the Supreme Court declared in *District of Columbia* v. *Heller*, 554 U.S. 570, 626-27 n.26 (2008), the 'longstanding prohibitions on the possession of firearms by felons' are 'presumptively lawful regulatory measures.'" Opp. at 10 (citation omitted).

In sum, the "virtuousness" detour is a dead-end. It adds nothing to the discussion, but another way to harp upon Binderup's moral failings of nearly 20 years ago.

B.  Binderup Never Argued That Firearms Prohibitions Must Match Those of the Eighteenth Century.

The Government correctly states that "Binderup offers no support for the assertion that a criminal conviction can warrant imposition of a

firearms prohibition only if it was punishable as a felony at the time of the framing." Opp. at 2.

That is because Binderup does not make that assertion. Nowhere has Binderup argued "that a criminal conviction cannot be a ground for imposing a firearms disability unless it was historically punished as a felony." *Id*. Obviously that is nonsense. Where is that argument in Binderup's briefing?

Binderup takes exception to that statement, and to the creative citation method underlying the Government's claim that "Binderup argues . . . that he is constitutionally entitled to possess a firearm because 'the actual conduct for which [Binderup] was convicted . . . was not subject to criminal sanction at, or before, the time of the Founding.'" Opp. at 11 (quoting Appellee's Br. at 56); 1 App. 69.

To understand the context of Binderup's quotation of the District Court's opinion, this Court should turn to the opinion's preceding page:

Defendants further contend that disarming plaintiff based on his Corruption of minors conviction is consistent with the scope of the Second Amendment as understood at the time of the adoption of the Bill of Rights. In support of that contention, defendants note that "one crime punishable under early English criminal law was carnal knowledge of a female under a particular age, regardless of the female's consent" – citing a 1576 English statute which prohibited such relations with "any woman child under the age of ten years."

1 App. 68 (citation omitted).

In keeping with its borderline ad hominem approach to this case, the Government then essentially compared Appellee to a child rapist. The District Court noted Appellee's response that the analogy is absurd and inappropriate, his unmitigated condemnation of child rape, and—directly refuting the Government's claim—the fact that he would not have been disarmed in the Framing Era. Binderup's opening brief here makes the same point—a proper response to the Government's false suggestion that Binderup would have been disarmed then and can therefore be disarmed now.

Perhaps stung by an actual historical demonstration that Binderup would *not* have been disarmed in 1791, the Government twists that straightforward response to its claim into a claim that Framing Era legal outcomes are the sine qua none of what must happen today. One such leap of logic would be unfortunate, but this is a pattern:

> Plaintiff declares that, regardless of the state's classification of the crime or the penalty imposed, "[t]he constitutional question would always concern Binderup's actual conduct, and the traditional justifications, if any, for disarming him for it." Binderup Br. 58. Plaintiff *thus insists* that even a firearms prohibition based on a felony conviction that entails a substantial prison sentence fails to pass constitutional muster if the precise conduct would not have been the basis for a felony conviction in the 18th or 19th centuries.

Opp. at 13 (emphasis added).

How does the Government derive the second sentence from the first?

That the relevant constitutional inquiry focuses on Binderup's conduct and the traditional justifications, if any, for disarming him over it, is straight out of *Barton*. It is a fair summation of this Court's stressing the role of "traditional justifications underlying [Section 922(g)(1)]," *Barton*, 633 F.3d at 173, and the requirement that one must "present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections," *id.* at 174. This holding does not in any way require that prohibitions be sustained only where they would have been sustained for identical conduct in 1791.

Federal judges and scholars take Binderup's claims seriously because the Supreme Court and this Court, among others, hold that the touchstone for disarmament is dangerousness, and that the presumption of felon disarmament is just that—a presumption. That does not mean that *all* felons may be constitutionally disarmed, nor does it mean that *all* non-felons are exempted from disarmament. It means that cases where the presumption applies are easier for the

Government. Cases where the presumption is lacking—like this one—will be more difficult for the Goverment.

Though completely irrelevant to this case, Binderup does agree—contrary to the Government's irresponsible briefing, but consistent with his—that people who physically abuse intimate partners or children should be disarmed, and that such disarmament is constitutional. And like this and other courts, Binderup would agree with that result not because domestic violence misdemeanants are "felons" (they are not) or because they were traditionally disarmed (they were not), but *because they are dangerous*, and the prohibition thus passes constitutional scrutiny even if it does not begin with that historical presumption. *Barton*, 633 F.3d at 172 n.2 (citations omitted); see also *United States* v. *Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013); *United States* v. *Chester*, 628 F.3d 673, 681-82 (4th Cir. 2010); *Gowder* v. *City of Chicago*, 923 F. Supp. 2d 1110, 1122 (N.D. Ill. 2012).

* * *

Some, perhaps many, Second Amendment claims are spurious. There are people who would come before this Court and argue that the Second Amendment freezes gun laws in amber at 1791; and that

disarmament might therefore only be visited upon Blackstonian felons, to the delight of drug dealers, wife beaters, and other villains not acknowledged by Framing Era law. Binderup is not that person.

Doubtless the Justice Department addresses such claimants frequently, and has perhaps fallen into a habit of repeating inapposite briefing and themes from other cases. More likely, the Government fabricates extreme and frivolous positions for Binderup because it has no answer for his actual argument.

### C. Constitutional Avoidance is Warranted Because As-Applied Challenges are a Real Feature of Today's Legal System.

There is nothing new in the Government's arguments to the effect that as-applied challenges to Section 922(g)(1) are not available. They are. If statistical surveys sufficed to override Binderup's claim, they should also defeat *all* as-applied claims, and swallow *Barton* whole.

But the Government no longer rests on having criminological surveys override the as-applied procedure. It now flatly calls for the Court to ignore *Barton*: "This Court should not accept Binderup's invitation to engage in an ad hoc determination of whether Binderup is distinguishable from others convicted of similar crimes based on unverifiable assertions about his personal life." Opp. at 21.

First, Binderup's assertions are indeed verifiable. Every day in America, people verify and disprove all manner of personal information about each other in a wide array of legal disputes. The federal government is very good at conducting background checks, pre-sentence reports, and even, on occasion, civil discovery. Indeed, for many years, Section 925(c) functioned very well, with the Government and reviewing district courts working together to separate the dangerous from the rehabilitated.

More fundamentally, this is not Binderup's "invitation," but as every circuit to have considered the matter understands—the Supreme Court's *command*. This Court certainly understands as much. What else is *Barton* but a test for distinguishing which people enjoy fundamental rights?[5]

---

[5]The Government's reliance on pre-*Heller* dicta from *Pontarelli* v. *U.S. Dep't of Treasury*, 285 F.3d 216 (3d Cir. 2002) (en banc), is unavailing. Courts may not have resources to investigate these cases, but the factual record in civil cases is always developed by the parties. If Congress believes there would be too many of these cases, it can create more judgeships, remove less important work from the courts, or restore Section 925(c) funding. After *Heller*, it is simply not possible that nobody can be bothered with this work.

To the Government, a federal court may just be a building that convicts people of various offenses and processes them for sentencing, and the idea that judges should actually spend time securing people's fundamental rights is a philosophical whimsy. It is not. If the Government has the time to prosecute and convict people, it has the time to ensure that they do not suffer unconstitutional collateral consequences. Courts have no more important business than safeguarding basic liberties. *Barton* is a substantial feature of the constitutional landscape, and this Court must exhaust statutory interpretation options before proceeding down the *Barton* road—particularly where the claim is strong enough to have convinced at least one judge.

D.      The Government's New Evidentiary Objections
        On Appeal Are Improper.

Recognizing, finally, that it has no answer to Binderup's claim, the Government *for the first time* argues that all of Binderup's evidence should have been ignored. "Nor should a court uncritically accept Binderup's assertion that his crime was 'non-violent' because the sex was consensual," as the relationship was "not meaningfully consensual in the eyes of the law." Opp. at 17.

Actually, *it was*. The Government is flat-wrong in asserting that the relationship was "not meaningfully consensual under the law of Pennsylvania." Opp. at 3. Binderup's employee was old enough to consent—*that* is a legislative judgment that the Government cannot undo.

More to the point, the relationship was in fact consensual, and nobody has ever submitted evidence to the contrary. Were it otherwise, Binderup would have been charged with and perhaps convicted of a much more serious offense. The Government did not object to any of Binderup's evidence here, and now is not the time for that.

CONCLUSION

The District Court's judgment should be affirmed, on either of Plaintiff's claims.

Dated:   June 26, 2015                  Respectfully submitted,

                                         /s/ Alan Gura
Douglas Gould                            Alan Gura
PIZONKA, RIELLEY, BELLO                    Counsel of Record
  & MCGRORY, P.C.                        GURA & POSSESSKY, PLLC
144 E. DeKalb Pike, Suite 300            105 Oronoco Street, Suite 305
King of Prussia, PA 19406                Alexandria, VA 22314
610.992.1300/610.992.1505               703.835.9085/703.997.7665

                                         *Counsel for Appellee/*
                                         *Cross-Appellant*

20

## CERTIFICATION OF BAR MEMBERSHIP

I certify that I am an attorney in good standing of the bar of the Third Circuit.

/s/ Alan Gura
Alan Gura

DATED: June 26, 2015

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B) because this brief contains 3,947 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.

3. The text of the electronic brief is identical to the text in the paper copies.

4. This file was scanned for viruses using a currently-subscribed Norton 360 Anti-Virus installation and was found to be virus-free.

/s/ Alan Gura
Alan Gura
Attorney for Plaintiff-Appellee/Cross-Appellant
Dated: June 26, 2015

## CERTIFICATE OF SERVICE

On this, the 26th day of June, 2015, I electronically filed the attached Brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on June 26, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 26th  day of June, 2015.


/s/ Alan Gura
Alan Gura